DAVID R. ZARO (BAR NO. 124334)
JOSHUA A. DEL CASTILLO (BAR NO. 239015)
ALANA U. THORBOURNE (BAR NO. 284591)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
515 South Figueroa Street, Ninth Floor
Los Angeles, California 90071-3309
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com
         jdelcastillo@allenmatkins.com
         athorbourne@allenmatkins.com

Attorneys for Receiver
DAVID P. STAPLETON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>     v.<br><br>YIN NAN "MICHAEL" WANG; WENDY KO; VELOCITY INVESTMENT GROUP, INC.; BIO PROFIT SERIES I, LLC; BIO PROFIT SERIES II, LLC; BIO PROFIT SERIES III, LLC; BIO PROFIT SERIES V, LLC; and ROCKWELL REALTY MANAGEMENT, INC.,<br><br>           Defendants. | Case No. CV 13-7553-JAK (SSx)<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER, DAVID P. STAPLETON, FOR ORDER AUTHORIZING AND APPROVING SALES OF LOAN PORTFOLIO AND REAL PROPERTIES OUT OF RECEIVERSHIP<br><br>[Notice of Motion and Motion; Declaration of David P. Stapleton; and [Proposed] Order submitted concurrently herewith]<br><br>Date:   May 12, 2015<br>Time:  10:00 a.m.<br>Ctrm:  23 - 3rd Floor<br>Judge:  Suzanne H. Segal |

1011918.02/LA

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................................1

II.    RELEVANT FACTUAL BACKGROUND AND PROPOSED
       SALES ................................................................................................2

       A.    Relevant Factual Background .................................................2

       B.    Proposed Loan Portfolio Sale ................................................4

             1.    The Marketing and Proposed Sale of the Loan
                   Portfolio .......................................................................5

       C.    Proposed Residential Real Property Sales ...........................7

             1.    Cherry Avenue ............................................................8

             2.    S. Meadow Lane ........................................................10

III.   THE RECEIVER RECOMMENDS AGAINST OVERBID
       PROCEDURES ................................................................................11

IV.    ARGUMENT ...................................................................................11

       A.    This Court Has Broad Discretion To Grant The Motion ....11

       B.    Overbid Procedures Are Unnecessary And Need Not Be
             Employed Here .....................................................................13

       C.    Further Notices And Appraisals Should Be Waived ...........14

       D.    The Court Should Also Grant The Receiver's Ancillary
             Relief, Identified Below .......................................................15

V.     CONCLUSION ...............................................................................16

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

1011918.02/LA

(i)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

CFTC. v. Topworth Int'l, Ltd.,
205 F.3d 1107 (9th Cir. 1999)..................................................................12

First Nat'l Bank v. Shedd,
121 U.S. 74 (1887) ....................................................................................13

Keybank Nat'l Ass'n v. Perkins Rowe Assocs., LLC,
2012 U.S. Dist. LEXIS 157828 (M.D. La. Nov. 2, 2012) ...........................14

SEC v. Am. Capital Invs., Inc.,
98 F.3d 1133 (9th Cir. 1996)....................................................................13

SEC v. Capital Consultants, LLC,
397 F.3d 733 (9th Cir. 2005).....................................................................12

SEC v. Elliot,
953 F.2d 1560 (11th Cir. 1992)............................................................12, 13

SEC v. Hardy,
803 F.2d 1034 (9th Cir 1986) ...................................................................11

SEC v. Wencke,
622 F.2d 1363 (9th Cir. 1980)...................................................................11

U.S. v. Heasley,
283 F.2d 422 (8th Cir. 1960) ....................................................................14

U.S. v. Little,
2008 U.S. Dist. LEXIS 93467 (E.D. Cal. June 30, 2008)...........................14

U.S. v. Peters,
777 F.2d 1294 (7th Cir. 1985) ..................................................................14

**Statutes**

28 U.S.C. § 2001..............................................................................1, 13, 14, 15

28 U.S.C. § 2001(a) .................................................................................14

28 U.S.C. § 2001(b) .................................................................................14

28 U.S.C. § 2002......................................................................................15

**Rules**

Local Rule 66-7 .......................................................................................15

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

1011918.02/LA

1

**Page(s)**

**Treatises**

2 Ralph Ewing Clark, <u>Treatise on Law & Practice of Receivers</u>
§ 482 (3d ed. 1992)........................................................................... 13

2 Ralph Ewing Clark, <u>Treatise on Law & Practice of Receivers</u>
§ 487 (3d ed. 1992)........................................................................... 13

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      INTRODUCTION.

In accordance with this Court's prior Orders, including its October 7, 2014 Order Granting in part Receiver David P. Stapleton's Application for Further Instructions (the "October 2014 Order"), David Stapleton (the "Receiver"), the Court-appointed receiver for Defendants Velocity Investment Group, Inc., Bio Profit Series I, LLC, Bio Profit Series II, LLC, Bio Profit Series III, LLC, Bio Profit Series V, LLC, Rockwell Realty Management, Inc., and their respective subsidiaries and affiliates (collectively, the "Receivership Entities" or "Entities"), hereby moves this Court to waive the requirements of 28 U.S.C. § 2001 and authorize and approve the sale of a Receivership Entity loan portfolio comprised of eleven (11) loans secured by real property (the "Loan Portfolio" or "Portfolio"), as well as the sale of the real properties located at 1337 Cherry Avenue., Beaumont, California 92223 and 1251 S. Meadow Lane. #144, Colton, California 92324[1] (collectively, the "Properties") out of receivership, on the terms described herein, and as reflected in the concurrently submitted Declaration of David P. Stapleton ("Stapleton Decl.").

As detailed below, and in accordance with the October 2014 Order, the Receiver evaluated a number of options for the disposition of the Loan Portfolio in order to determine which would yield the greatest net benefit to the estate of the Receivership Entities ("Estate").  The Receiver ultimately determined that based on the status and nature of the loans that comprise the Portfolio, selling the loans together, as a portfolio, would result in the highest net benefit to the Estate. Thereafter, the Receiver commenced marketing and sale efforts in connection with the Loan Portfolio and received multiple offers to purchase the Portfolio.

---

[1]  The Receiver previously requested this Court's approval for the sale of Unit Number 184 at the 1251 S. Meadow Lane, Colton, California property.  (See. Docket No. 175.)  The present request is for authority to sell Unit Number 144 at 1251 S. Meadow Lane.

1    Similarly, following the entry of the October 2014 Order, the Receiver

2  engaged a real property broker, Todd Busch, of the Open House Center ("Agent"),

3  and commenced marketing and sale efforts of a number of real properties owned by

4  the Receivership Entities, including the Properties.  These marketing and sale efforts

5  have been successful, and the Receiver has received multiple offers to purchase the

6  Properties.

7    The Receiver now requests that the Court authorize and approve the sale of

8  the Loan Portfolio and the Properties pursuant to the terms of those offers that he

9  has determined, in his reasonable business judgment, to be the highest and best

10  purchase offers for the Loan Portfolio and the Properties.  Based on his review of

11  the offers submitted for Court approval, the Receiver believes that the sale of the

12  Portfolio and the Properties will result in an aggregate recovery for the Estate, based

13  on gross sales prices, in excess of $500,000.00, less commissions and administrative

14  fees and costs incurred in connection with securing Court approval of the proposed

15  sales.  Accordingly, the Receiver believes that the proposed sales of the Portfolio

16  and the Properties are in the best interests of the Receivership Entities, and should

17  be authorized and approved by the Court.

18  **II.    RELEVANT FACTUAL BACKGROUND AND PROPOSED SALES.**

19    **A.    Relevant Factual Background.**

20    This Court appointed a Receiver for the Receivership Entities on April 1,

21  2014.  (See Docket No. 93.)  The Receiver was specifically identified and his

22  appointment reaffirmed by this Court on April 8, 2014.  (See Docket No. 98.)

23  Pursuant to the Court's various Orders, the Receiver was charged with, among other

24  things, marshaling and preserving the assets of the Receivership Entities

25  ("Receivership Assets"), conducting a review of the business and financial activities

26  of the Receivership Entities, identifying and proposing a course of action for

27  addressing outstanding litigation against the Receivership Entities, and making

28

1   recommendations to the Court regarding whether to retain jurisdiction over the
2   Receivership Entities, or whether they should be placed into bankruptcy.

3         The Receiver submitted his Initial Report and Application for Further
4   Instructions (the "Initial Report") to the Court on August 20, 2014, addressing the
5   above topics, among others.  (See Docket Nos. 126, 127.)  In addition, the Initial
6   Report identified a number of loans made by and payable to the Receivership
7   Entities.  (See Docket Nos. 126, 127.)  These loan assets of the Receivership Entities
8   had aggregate initial principal balances of approximately $1,235,000.00.  (See
9   Docket Nos. 126, 127.)  The Initial report sought Court authority to market and sell
10  the Receivership Entity loans.  The Court's October 2014 Order substantially
11  granted the relief requested in the Initial Report.  (See Docket No. 145.)  It provided,
12  in pertinent part, that the Receiver was authorized:

13              "to market and sell any saleable Receivership Entity
14              loans, and to settle with borrowers via discounted pay-
15              offs, wherever the Receiver deems it appropriate to do
16              so."  (See Docket No. 145 at 3:6-9.)

17        The Initial Report also identified a number of real properties owned by the
18  Receivership Entities, including the Properties, and sought Court authority to market
19  and sell those properties.  The Court's October 2014 Order granted this relief as
20  well.  (See Docket No. 145.)  It provided, in pertinent part, that the Receiver was
21  authorized to:

22              "preserve and prepare all properties with equity for sale,
23              and to market and sell them for the benefit of the Estate
24              (relying on in-house or third party real property brokers,
25              as the Receiver deems appropriate), subject to Court
26              approval of specific, proposed sales."  (See Docket No.
27              145 at 2:16-21.)

28

## B.     Proposed Loan Portfolio Sale.

Prior to marketing the Loan Portfolio, the Receiver conducted due diligence on the Receivership Entities' interest in the loans comprising the Portfolio, as well as the nature and status of the loans.  (See Stapleton Decl. ¶ 2.)  Based on the Receiver's review of recorded documents and other related title documents, the Receiver determined that the loans were assets of Receivership Entities and were secured by real properties located in California.  (Id.)  The Receiver also obtained documentation pertaining to the loans from entities servicing a number of the loans, including Del Toro Servicing.  (Id. at ¶ 3.)  Further investigation into the nature of the loans revealed that the loans were largely made to distressed borrowers and that none of the liens associated with the loans are in first position.  (Id.)  In fact a number of the liens are in third or fourth position, and the properties which secure the liens do not appear to have sufficient equity to cover all outstanding, secured debt.  (Id.)  Accordingly, the loans were potentially subject to being wiped out by a foreclosure by a senior lien.  (Id.)

After the entry of the Court's October 2014 Order, and as described in more detail below, the Receiver immediately contacted the loan borrowers to investigate the possibility of a disposition of the Portfolio via discounted pay-offs or other arrangements with borrowers.  (Id. at ¶ 4.)  Unfortunately, as a consequence of these discussions, the Receiver determined that such arrangements were not feasible, due in large part to the borrowers' individual circumstances.  (Id.)  Many borrowers were simply not in a financial position strong enough to complete a pay-off of their loans, however discounted, while others elected not to incur the tax implications potentially associated with an early, discounted pay-off.  (Id.)

As a result of his determination that the loans could not be disposed of via a direct, discounted sale to borrowers, and after a thorough review of market conditions, the Receiver determined that selling the loans as a portfolio, as opposed to selling each loan piece-meal, would yield a greater benefit to the Estate.  (Id. at

¶ 5.)  Specifically, if able to be sold individually, each loan would likely result in a lesser return to the estate than if sold as part of the Portfolio because the loans are secured by second, third or even fourth position liens, meaning that each alone is at risk of being wiped out by a foreclosure of a senior lienholder.  Only by aggregating the loans into the Portfolio could the risk be mitigated to the point where the loans were saleable on the open market (Id.)  In addition, packaging the loans as a portfolio would significantly reduce the transactional administrative costs associated with properly negotiating and documenting a loan sale transaction.  (Id.)  Accordingly, the Receiver has determined, in his reasonable business judgment, that marketing and selling the loans as a portfolio, as opposed to an individual basis, will yield a greater net benefit to Receivership Estate.

Having arrived at a decision to sell the loans in an aggregated portfolio, the Receiver publicly listed the Loan Portfolio for sale on the Loan Multiple Listing Service (the "Loan MLS"), a listing service used to market and sell residential home loans to the public, investors, and loan administration professionals.  (Id. at ¶ 6.)  Since posting the Portfolio for sale on the Loan MLS, the Receiver has received four (4) offers to purchase the Portfolio and, as detailed, below, undertook a bidding process to solicit the highest and best bid from the interested parties.  Having secured what he believes to be the highest and best bid available for the Loan Portfolio, the Receiver respectfully requests that the Court authorize and approve its sale in accordance with the terms detailed herein.

       1.    <u>The Marketing and Proposed Sale of the Loan Portfolio.</u>

**The Receiver proposes to sell the Loan Portfolio, consisting of eleven (11) loans secured by residential real properties, for $231,235.03[2]**

---

[2] For the purpose of the Loan Portfolio sale, a commission of 6% of the sale price will be paid to the Stapleton Group, Inc. to compensate for necessary transactional and coordination services not billed to the receivership, in accordance with industry standards.

As noted above, the Receiver conducted a bidding process soon after listing the Portfolio for sale on the Loan MLS.  (See Stapleton Decl. ¶ 6)  In anticipation of the prospective buyers' due diligence requirements, the Receiver caused his counsel to prepare and circulate an appropriate pre-diligence Non-Disclosure Agreement ("NDA") to the four (4) initial bidders, and assembled a diligence packet for each prospective buyer, consisting of all the relevant information in the Receiver's possession regarding the loans included within the Portfolio, including promissory notes, deeds of trust, preliminary title reports and any other documentation in his custody and control pertaining to the loans.  (Id.)  Following the execution of the NDAs, the Receiver delivered these due diligence packets to the interested parties. (Id.)

Shortly after the potential bidders submitted their initial offers and were provided the due diligence packets, the Receiver requested that each of the four (4) interested parties present a best and final offer to purchase the Loan Portfolio.  (Id. at ¶ 7.)  Three of potential bidders submitted best and final offers.  (Id.)  The highest and best offer received for the Portfolio was $231,235.03.  (Id.)  The Receiver has determined that this purchase price is reasonable, given the nature of the loans, their security, and prevailing market conditions as reflected in, among other things, the Loan MLS.  (Id.)  Having made a preliminary decision to recommend court approval at this amount, the Receiver and the prospective buyer submitting the highest and best offer then entered into a Purchase and Sale Agreement and Joint Escrow Instructions ("Loan PSA") (Id. at ¶ 7, Ex. 1.).  The Loan PSA is subject to Court approval, of course.

In addition to providing for the purchase and sale of the loans comprising the Portfolio, and among other things, the Loan PSA requires the Receiver and his potential buyer comply with certain obligations of the Real Estate Procedures Act ("RESPA").  Specifically, under RESPA, residential mortgage borrowers must be timely notified when their loans are sold and the servicing rights transferred to

1  another party.  The Loan PSA expressly requires that such notice be provided in

2  compliance with RESPA by both the Receiver and his prospective buyer, upon

3  Court approval of the recommended sale.  This correspondence will include, at a

4  minimum, notification of the transfer for each loan and instructions regarding the

5  remission of loan payments after the closing date.

6  　　　　The Receiver accordingly respectfully submits that the proposed sale of the

7  Loan Portfolio is appropriate at this time, and will yield a market-rate benefit to the

8  estate, while maximizing borrower protections, including in connection with

9  RESPA.  The Receiver therefore requests that the Court authorize and approve the

10  sale of Loan Portfolio in accordance with the terms described herein and in the Loan

11  PSA.

12  　　　　　**C.　　Proposed Residential Real Property Sales.**

13  　　　　After the entry of the Court's October 2014 Order, and as more specifically

14  detailed below, the Receiver directed Agent to list the real properties located at 1337

15  Cherry Avenue, Beaumont, California 92223 ("Cherry Avenue"), 1251 S. Meadow

16  Lane #144, Colton, California 92324 ("S. Meadow Lane") (again, collectively, the

17  "Properties") for sale on the Multiple Listing Service ("MLS"), the listing service

18  most commonly and broadly used to market and sell residential real properties.  (See

19  Stapleton Decl. ¶ 8.)  Agent marketed the Properties, following a detailed marketing

20  and sale plan developed by the Receiver aimed at soliciting the highest and best

21  offers for the Properties.  (Id. at ¶ 9.)

22  　　　　Specifically, prior to marketing the Properties in the MLS, the Receiver

23  directed Agent to visit the Properties to assess their respective physical condition,

24  and to make preliminary sale recommendations based on Agent's study of the local

25  residential real property market, the neighborhoods in which the Properties are

26  situated, and other relevant factors.  (Id. at ¶ 10.)  Once these recommendations were

27  made, Agent provided the Receiver with an independent broker's opinion of value

28  ("BOV") for each of the Properties, which included information on comparable sales

in the local markets.  (Id.)  The Receiver reviewed all available, relevant market data, including Agent's BOVs and pricing information obtained from public sources. (Id.)  After completing his review, the Receiver discussed the anticipated values and conditions of the Properties with Agent to determine final listing prices for each Property.  (Id.)  The Receiver therefore submits that his marketing efforts satisfy the industry standard and were sufficient to solicit fair offers at fair market value for the Properties.

Once the Receiver, in conjunction with Agent, had determined the anticipated final listing prices for the Properties, Agent was directed to and hosted "walk-throughs" and open-houses for each Property with potential purchasers, collected offers, and prepared counter offers at the Receiver's direction to obtain the best and highest price for each Property.  (Id. at ¶ 11.)  Indeed, in an effort to solicit the highest and best possible offers for the Properties, the Receiver implemented an aggressive strategy to pursue sales at prices at or better than Agent's established BOV values, responding quickly to interested parties so as to ensure that prospective buyers willing to meet the Receiver's prices for the Properties remained committed to the sales proposed herein.  (Id.)  Specifics for each Property are as follows:

      1.   Cherry Avenue.

**The Receiver proposes to sell the Cherry Avenue Property – a residential property consisting of a 3-bedroom, 1.5 bathroom home in Beaumont, California, for $184,000.[3]**

Immediately upon listing Cherry Avenue on the MLS, and prior to organizing an open house to show the Property, the Receiver obtained two (2) initial offers. (See Stapleton Decl. ¶ 12.)  The Receiver submitted counter-offers in response to

---

[3]  For each of the sales proposed herein, the Receiver anticipates paying commissions of 6% of the sale price of each Property, which is inclusive of 1% to the Receiver to compensate for required transaction administrative coordination services not billed to the receivership, in accordance with industry standards and the Receiver's previous representations to the Court.

1  each and then received a third offer that was higher than the original offers, the

2  original counter-offers, and the anticipated list price for the Property.  (Id.)  As a

3  result of a property inspection performed, the prospective buyer who had submitted

4  the highest offer attempted to submit certain requests for repairs. (Id.)  After

5  continued negotiations, the prospective buyer agreed to *increase* his/her offer and

6  purchase the property on an as-is/where-is basis, releasing the Receiver and Agent

7  from any claims or liability arising in connection with the Cherry Avenue Property,

8  in exchange for a credit to the purchase price in the amount of $20,000.  (Id.)  Even

9  when taking into account the requested $20,000 credit, the proposed purchase price

10  for the Cherry Avenue property is still significantly higher than any of the other

11  offers received.  (Id.)

12      The Receiver therefore selected this third, higher offer for recommendation to

13  the Court, as it reflected the best sale price and terms obtained for the Cherry

14  Avenue property.  (Id.)  The Receiver and the anticipated buyer entered into a

15  contingent Purchase and Sale Agreement and Joint Escrow Instructions ("PSA")[4].

16  (Id. at ¶ 12, Ex. 2).  The Cherry Avenue property buyer's offer provides the specific

17  purchase price, the time period to close the escrow following Court approval, and

18  the amount of the deposit paid into escrow, if any.  (Id.)

19      Assuming the Court approves the proposed sale of the Cherry Avenue

20  property as proposed here, the Receiver will convey the Receivership Entities' right,

21  title, and interest in the Property to the buyer via a grant deed, upon close of escrow.

22      Based on the size of the Cherry Avenue property, its condition, location, and

23  the prevailing market rates in the area, the Receiver has determined, in his

24  reasonable business judgment, that the proposed sale price and the terms set forth in

25

26  [4]  Because the contemplated sales of the Properties reflect sales of residential
     properties to ordinary purchasers, the proposed purchases were memorialized
27  using the industry standard California Association of Realtors forms, referred to
     herein for ease of reference as "Purchase and Sale Agreements and Joint Escrow
28  Instructions."  The PSAs, like all agreements to sell Receivership Assets, are
     contingent upon, among other things, the approval of this Court.

1  the PSA are fair and reasonable and would be in the best interests of the Estate.

2  (Id.)  Accordingly, the Receiver respectfully requests that the Court authorize and

3  approve the sale of the Cherry Avenue property in accordance with the terms

4  described herein and in the PSA.

5         2.      S. Meadow Lane.

6         **The Receiver proposes to sell the S. Meadow Lane Property, a residential**

7  **property consisting of a 2-bedroom, 2-bathroom home in Colton, California,**

8  **for $106,500.**

9         At the Receiver's direction and shortly after its engagement, Agent hosted an

10  open house for the S. Meadow Lane property. (See Stapleton Decl. ¶ 13.)   The

11  Receiver thereafter received one (1) offer for S. Meadow Lane, and no other offers

12  have been forthcoming.  (Id.)  In response, the Receiver submitted a counter-offer

13  with additional terms in the form of an addendum providing, among other things, that

14  the S. Meadow Lane property is to be sold "as is, where is," and the offer was

15  ultimately accepted.  (Id.)  As with the contemplated sale of the Cherry Avenue

16  property, the Receiver and his anticipated buyer entered into a contingent PSA in

17  connection with the anticipated purchase of the S. Meadow Lane property. (Id. at Ex.

18  3.)

19         Assuming the Court approves the proposed sale of the property as contemplated

20  herein, the Receiver will convey the Receivership Entities' right, title, and interest in

21  the Property to the buyer via a grant deed, upon close of escrow.

22         Based on the size of the S. Meadow Lane property, its condition, location, and

23  the prevailing market rates in the area, the Receiver has determined, in his

24  reasonable business judgment, that the proposed sale price and the terms set forth in

25  the PSA are fair and reasonable and would be in the best interests of the Estate.

26  (Id.)  Accordingly, the Receiver respectfully requests that the Court authorize and

27  approve the sale of the S. Meadow Lane property in accordance with the terms

28  described herein and in the PSA.

III.    **THE RECEIVER RECOMMENDS AGAINST OVERBID**
        **PROCEDURES.**

The Receiver recommends against the imposition of overbid and public notice procedures in connection with the proposed sales of the Loan Portfolio and the Properties.  As detailed above, the Receiver has already undertaken a detailed and extensive marketing and sale effort for these assets, including listing the Loan Portfolio on the Loan Multiple Listing Services and the Properties on the MLS, undertaking a bidding process for parties interested in purchasing the Portfolio, engaging Agent to market the Properties as actively and widely as possible, and making the Properties available for inspection to any interested parties, including via traditional "open houses" and other inspections.  In other words, the Receiver has consistently marketed these assets as publicly and openly as possible, and has solicited the highest and best bid available for the Loan Portfolio and each of the Properties.  As such, and in the Receiver's reasonable business judgment, the purchase offers submitted for Court approval reflect the highest and best offers that are likely to be forthcoming for the Loan Portfolio and each of the Properties, and should be approved in their present form, without the imposition of any overbid procedures that could potentially jeopardize the current, proposed sales.  Indeed, addressed in Section IV(B), below, such procedures need not be imposed here.

IV.    **ARGUMENT.**

   A.    **This Court Has Broad Discretion To Grant The Motion.**

"The power of a district court to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief."  <u>SEC v. Wencke</u>, 622 F.2d 1363, 1369 (9th Cir. 1980).  The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors."  <u>SEC v. Hardy</u>, 803 F.2d 1034, 1038 (9th Cir 1986).  As the appointment

1   of a receiver is authorized by the broad equitable powers of the Court, any

2   distribution of assets must also be done equitably and fairly.  See SEC v. Elliot, 953

3   F.2d 1560, 1569 (11th Cir. 1992).

4   District courts have the broad power of a court of equity to determine the

5   appropriate action in the administration and supervision of an equity receivership.

6   See SEC v. Capital Consultants, LLC, 397 F.3d 733, 738 (9th Cir. 2005).  The Ninth

7   Circuit explained:

8               A district court's power to supervise an equity

9               receivership and to determine the appropriate action to be

10              taken in the administration of the receivership is

11              extremely broad. The district court has broad powers and

12              wide discretion to determine the appropriate relief in an

13              equity receivership.  The basis for this broad deference to

14              the district court's supervisory role in equity

15              receiverships arises out of the fact that most receiverships

16              involve multiple parties and complex transactions. A

17              district court's decision concerning the supervision of an

18              equitable receivership is reviewed for abuse of discretion.

19  Id. (citations omitted.); see also CFTC. v. Topworth Int'l, Ltd., 205 F.3d 1107,

20  1115 (9th Cir. 1999) ("This court affords 'broad deference' to the court's supervisory

21  role, and 'we generally uphold reasonable procedures instituted by the district court

22  that serve th[e] purpose' of orderly and efficient administration of the receivership

23  for the benefit of creditors.").

24  Accordingly, this Court has broad equitable powers and discretion to grant the

25  Motion and authorize and approve the sales proposed here by the Receiver.

26

27

28

**B.** **Overbid Procedures Are Unnecessary And Need Not Be Employed Here.**

In many cases, sales of receivership property in the federal courts are concluded via "a public sale in the district wherein [the] … receiver was first appointed, at the courthouse of the county, parish, or city situated therein in which the … property is located."  28 U.S.C. § 2001.  However, the Court's broad discretion (detailed above) also extends to the procedure for accomplishing a proposed sale.  Id.  ("Such sale shall be upon the terms and conditions as the court directs.").

In other words, it is generally conceded that a court of equity having custody and control of property has power to order a sale of that property on the conditions of its own choosing.  See, e.g., Elliott, supra, 953 F.2d at 1566 (finding that the District Court has broad powers and wide discretion to determine relief in an equity receivership).  "The power of sale necessarily follows the power to take possession and control of and to preserve property."  SEC v. Am. Capital Invs., Inc., 98 F.3d 1133, 1144 (9th Cir. 1996), cert. denied 520 U.S. 1185 (decision abrogated on other grounds) (citing 2 Ralph Ewing Clark, Treatise on Law & Practice of Receivers § 482 (3d ed. 1992) (citing First Nat'l Bank v. Shedd, 121 U.S. 74, 87 (1887)).  "When a court of equity orders property in its custody to be sold, the court itself as vendor confirms the title in the purchaser."  2 Ralph Ewing Clark, Treatise on Law & Practice of Receivers § 487.

Here, the Receiver respectfully submits that, given his widespread and public marketing efforts, overbid procedures are unnecessary, and that the Court should exercise its broad discretion in approving the proposed sales of the Portfolio and the Properties as detailed herein, without requiring overbid procedures or a public sale.  Specifically, as noted above, the Receiver has undertaken a detailed and extensive marketing and sale effort for the Portfolio and the Properties, including listing the Portfolio on the Loan MLS, undertaking a post-listing bidding process aimed at

1    soliciting the highest and best offer available, listing the Properties on the MLS,

2    engaging Agent to market the Properties as actively and widely as possible, and

3    making the Properties available for inspection to any interested parties.  The offers

4    submitted to the Court for approval reflect the highest and best offers for the Loan

5    Portfolio and for each of the Properties.  Accordingly, overbid procedures and a

6    public auction are unlikely to result in the submission of any offers qualitatively

7    superior to those already secured and submitted for Court approval.  Moreover, with

8    respect to the Properties, which are residential in nature and anticipated to be sold to

9    relatively unsophisticated buyers unfamiliar with the complexity of receiver's sales,

10   an overbid requirement could endanger the sales proposed herein, potentially

11   discouraging the Receiver's proposed buyers from completing their purchases.  As

12   such, the Receiver strongly recommends that the Court approve the sales proposed

13   herein, without imposing an overbid or auction requirement.

14          **C.     Further Notices And Appraisals Should Be Waived.**

15          28 U.S.C. § 2001(b), governing sales of real property out of receivership,

16   further provides that notice shall be given "by publication or otherwise as the court

17   directs …"  Thus, "[t]he statute on its face vests the court with discretion in directing

18   the terms and conditions of the public sale."  Keybank Nat'l Ass'n v. Perkins Rowe

19   Assocs., LLC, 2012 U.S. Dist. LEXIS 157828, *4 (M.D. La. Nov. 2, 2012); see also

20   U.S. v. Little, 2008 U.S. Dist. LEXIS 93467, *4-5 (E.D. Cal. June 30, 2008)

21   (finding that "[t]he Court has broad discretion in setting the terms and conditions of

22   a sale pursuant to 28 U.S.C. §  2001."); U.S. v. Heasley, 283 F.2d 422 (8th Cir.

23   1960) (finding that in the context of 28 U.S.C. § 2001(b), "the matter of confirming

24   a judicial sale rests in the sound judicial discretion of the trial court …"); U.S. v.

25   Peters, 777 F.2d 1294 (7th Cir. 1985) (noting that, as argued above, 28 U.S.C.

26   §  2001(a) authorizes a court to direct the terms and conditions of the sale).

27          Here, the Notice of Motion provided on the Receiver's website is reasonable

28   given the unique nature of the Portfolio and the residential nature of the Properties.

1  The Receiver submits that further publication of notice would impose significant
2  costs upon the Receivership Entities with little or no corresponding benefit.
3  Accordingly, to the extent 28 U.S.C. §§ 2001, 2002, and Local Rule 66-7 require
4  further mailing or publication of notice, appraisals, or other procedures, such
5  provisions should be waived here.

6          D.      **The Court Should Also Grant The Receiver's Ancillary Relief,**
7                  **Identified Below.**

8          The Receiver further requests that the Court authorize payment from the
9  proceeds of sales of the Properties to cover valid liens, taxes, and any other claims
10 on the Properties, subject to any objections to such liens, taxes, or claims by the
11 Receiver, pursuant to its broad equitable powers with respect to the administration
12 of receivership estate assets.

13         Finally, and as noted in Section II, above, the Receiver requests authority to
14 pay an aggregate commission in the amount of 6% of the final purchase price for
15 each Property.  Based on his extensive experience in real estate transactions, the
16 Receiver believes that such a commission is commercially reasonable and consistent
17 with real estate industry standards.  (See Stapleton Decl. ¶ 14.)

18         Similarly, the Receiver requests authority to be paid an aggregate commission
19 in the amount of 6% of the final purchase price of the Loan Portfolio as
20 compensation for transactional and coordination services not billed by the hour.
21 The Receiver believes, in his reasonable business judgment, and based on his prior
22 experience with similar loan sales, that a commission of 6% of the purchase price is
23 commercially reasonable and consistent with or even below market rates.  In
24 addition, this amount is substantially less than the administrative fees that would
25 have been billed to the Receivership Estate, had the Receiver and his staff billed for
26 services on an hourly basis. (See Stapleton Decl. ¶ 15.)

27
28

**V.    CONCLUSION.**

For the foregoing reasons, the Receiver respectfully requests that this Court enter an Order granting the instant Motion, and authorizing and approving the proposed sales of the Loan Portfolio and Properties as detailed herein.

Dated:  April 2, 2015                          ALLEN MATKINS LECK GAMBLE
                                                         MALLORY & NATSIS LLP
                                               DAVID R. ZARO
                                               JOSHUA A. DEL CASTILLO
                                               ALANA U. THORBOURNE

                                               By:_____*/s/*____*Joshua A. del Castillo*__
                                                         JOSHUA A. DEL CASTILLO
                                                         Attorneys for Receiver
                                                         DAVID P. STAPLETON

# PROOF OF SERVICE

*Securities and Exchange Commission v. Yin Nan "Michael" Wang; Velocity Investment Group, et al.*
USDC, Central District of California – Western Division (Los Angeles) – Case No. 2:13-cv-07553-JAK-SSx

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 515 S. Figueroa Street, 9th Floor, Los Angeles, California 90071-3309.

A true and correct copy of the foregoing document(s) described as: **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER, DAVID P. STAPLETON, FOR ORDER AUTHORIZING AND APPROVING SALES OF LOAN PORTFOLIO AND REAL PROPERTIES OUT OF RECEIVERSHIP** will be served in the manner indicated below:

1.   **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – the above-described document will be served by the Court via NEF.  On **April 3, 2015**, I reviewed the CM/ECF Mailing Info For A Case for this case and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

   - **Andrew Cowan**
     acowan@gallo-law.com

   - **Lynn M. Dean**
     deanl@sec.gov, LAROFiling@sec.gov, kassabguir@sec.gov, berryj@sec.gov, irwinma@sec.gov

   - **Joshua A. del Castillo**
     jdelcastillo@allenmatkins.com,athorbourne@allenmatkins.com

   - **Edward Gartenberg**
     egartenberg@gghslaw.com, mdolukhanyan@gghslaw.com, ssimich@gghslaw.com

   - **Philip C. Law**
     plaw168@gmail.com

   - **REO Property Group, LLC**
     pLaw168@gmail.com

   - **David J. VanHavermaat**
     vanhavermaatd@sec.gov, LAROFiling@sec.gov, carnegieo@sec.gov, berryj@sec.gov,irwinma@sec.gov

2.   **SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served)**:  On **April 3, 2015** , I served the following person(s) and/or entity(ies) in this case by placing a true and correct copy thereof in a sealed envelope, U.S. Mail first class, and/or with an overnight mail service addressed as stated below.  I am readily familiar with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. postal service on that same day in the ordinary course of business.

989965.30/LA

- 1 -

Franchise Tax Board (FTB)                                    **Via U.S. Mail**
P.O. Box 2952
Sacramento, CA  95812-2952

Internal Revenue Service                                     **Via U.S. Mail**
880 Front Street
San Diego, CA  92101-8869

Jason I. Bluver, Esq.                                        **Via U.S. Mail**
Gartenberg Gelfand Hayton LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, CA  90017

3.      **SERVED BY PERSONAL DELIVERY OR FACSIMILE (indicate method for each person or entity served)**:  On **____**, I served the following person(s) and/or entity(ies) on the attached Service List at the last known address(es) in this case by personal delivery.  I caused such envelope to be delivered by hand to the offices of the addressee by delivering same to an employee of Nationwide Attorney Service located at 1609 James M. Wood Blvd., Los Angeles, California  90017.

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on **April 3, 2015** at Los Angeles, California.


/s/  *Martha Diaz*
Martha Diaz

989965.30/LA

- 2 -